Madam Clerk, please call the first case of the morning. 2090344, Caterpillar, Inc. v. Flores Counsel, you may proceed. May it please the Court, Counsel, my name is Jennifer Kiestewetter and I'm here on behalf of the, of Graciano Flores, the petitioner on the initial matter. And I'm here today to ask you to affirm the decision of the Workers' Compensation Commission. This case was found to be compensable by the arbitrator and affirmed by the Commission and then it was then reversed by the Circuit Court. And I'm here today to ask you to reverse the decision of the Circuit Court for a couple of reasons. Can I ask you a question? Sure. The plaintiff before the Circuit Court was Caterpillar, was it not? That is correct. So you've got a bad caption on your briefs. You have to, your briefs in the appellate court, your captions must be the same captions that the case had at the Circuit Court. So you can't change it around because she's now the appellant. It should read Caterpillar Plaintiff Appellee versus Graciano Flores, the Illinois Workers' Compensation Commission Defendant Appellant. The Supreme Court rule is very specific. We wind up changing it and then you people can't find the decisions because it has a new name. Okay. I appreciate. Thank you for pointing that out, Your Honor. In my initial notice of filing, that is how I had it. And when I spoke to the court's office, I was instructed that it was to be changed. So I apologize. I believe my initial notice of filing was correct then. So I apologize for the confusion. No, it wasn't. If somebody from the court office told you otherwise, if you could tell us who it is, we'll straighten them out. Okay. Yes, and I will definitely check into that. I think my initial filing in this court would have been correct then, Your Honor. Okay. With regards to issues other than that, and I apologize for that. The first issue regarding whether or not the accident arose out of it in the course of employment has to do with the issue of increased risk. The first issue that was pointed out, which in my opinion is an easy one, is whether there was a safety violation in this case. And I think the answer is it's irrelevant here. Based upon Saunders, which was then distinguished in the Gerald Hines case here, it doesn't matter whether he was violating a safety rule at Caterpillar or not. It was clear he was doing his job when this occurred. And I think the Gerald Hines case points out here there's a difference between a prohibited activity when you're not in the course of employment, when you're not doing your job duties, and when you are. There's quite a bit of testimony in hearing regarding whether or not he was violating a rule by sitting on a tractor frame. There's no testimony here that anyone was ever reprimanded for doing that. And what I would say to you is that's really irrelevant here because we know he was doing the job of a spotter at the time he got hurt. So I would ask this court to reject any argument regarding that because I do think it's irrelevant. With regards to the main issue in front of you, which is whether or not this arose out of it in the course of employment due to increased risk of injury, really, although in some ways this is phrased as a legal issue, I think this is a manifest weight factual finding issue. Because if you look at the arguments here made by Caterpillar, they're essentially arguing to you the commission is wrong in their factual finding that speed here is an inherent risk of the job of a spotter. That's a factual finding. And I would ask this court to uphold that, that it's not against the manifest weight of the evidence. That factual finding is supported by evidence. What evidence is it supported by? It is supported by the testimony of Dennis Strack, who testified in this case, we prefer that the spotters be on their feet. They need to be aware of what's going on. And he admitted that the job of the spotter was to look out for other machinery and basically to look out for what the overhead work was being done, to make sure that there was a clear way for them and that no other machines interfered. He admitted they had to be aware, and that's why he wanted them on their feet, is what he testified to. In addition, Mr. Flores, his initial accident report indicates that he got up fast to react to someone overhead. You know he got up fast, but the question becomes, did his job require him to get up fast? Our understanding is that Stark testified, he denied that a hoist spotter was expected to move quickly in responding to coworkers. He denied that, but that was after he testified that he wanted them on their feet because they had to be aware of their surroundings. So I think that's a little inconsistent with regards to what their actual job was. If a spotter was not attentive and aware of what was going on, what could go wrong? From what I understand, it would be dangerous. Machines could collide, someone could get in the way of other work that was going on overhead. That was a particular job of the spotter. And I think a certain common sense element would say, would you really need a spotter if there weren't some type of potential danger, if there weren't a need to be looking out above? Well, we're mixing two separate concepts. I think it would be clear and obvious that a spotter has to be alert and be aware of what's going on. The issue is this issue of speed. I don't see that the claimant himself ever said that his job required a fast pace or involving a quick and speedy response to anything. He has to be alert. He has to be aware. He has to be ready to move. It doesn't say anything, he's got to jump out of a chair. He himself never said he had to move fast, did he? He himself indicated in his testimony that it was his job to respond. Right. When they were calling him, he had to be alert. Mr. Strack testified to that as well, and that he may be required to move the hoist up above. I think there is support for the Commission's finding here of the necessity of speed. Mr. Strack admitted that he was aware of other spotters who had sat down before. So, you know, the concept of did he have to hurry up and get up and react to the call, I guess the answer would be yes. That's his job as a spotter, which is what they were saying here. If someone calls above, it's his job to react. There were discussion in the record as to the fact that, well, he may sit for a while and not have to do anything. I think that's irrelevant. The point is when he's called above, he has to react. To be aware, why did he have to be aware? Because when they call, he had to react. I don't think it's against the manifest weight here that the Commission found implicit in that, that speed was an inherent element here. What happened here was they called his name. He wasn't just getting up off of a tractor frame because he didn't feel like sitting anymore. He was getting up because his name was called. I think those are different circumstances here. When his name is called, he has to react. So you're hanging your hat then basically totally on speed because does the act of getting up, standing up out of a chair and turning then to go somewhere, is that some type of an act that exposes him to greater risk than anybody, thousands of people every day getting up out of chairs and going places at the workplace? I think the Commission hung their hat on speed as well. I think there is a difference, and that is why I think this case is compensable, and the Commission found it compensable, as to whether he's put at an increased risk as a spotter. So the finding of the Commission that speed here was inherent I think is important. Well, it is, but we're groping for it because, as you know, the test is the manifest weight. The record, the evidence has to support the Commission's finding somewhere. They simply can't engraft an element into a job if it's not in the evidence. So that's what I think we're groping for. Where in the evidence is speed a requirement of this job? And where in the evidence speed is inherent to this job is the fact that we have the supervisor testifying that as a spotter he had to be aware his job was to look out for other machinery and to basically, when he's called upon, to do what is necessary from the overhead workers. So in that is the element of speed. And Mr. Strack admitted that he had to be aware, and that's why he wanted him on his feet. He admitted that, but then went on to say, no, speed wasn't required. Well, if speed wasn't required, why did you want him to be on his feet? So would you be saying that at any security job speed is an inherent element? Because you can certainly envision you're a security guard in any building here in the city. If something happens, you probably are going to be required to move relatively quickly, are you not? So does every job that involves looking out for something, does the speed become an inherent part of any job where you're required to be alert? I think you have to look at the action, whether they were in the course of the employment and the actual action that's being done. If a security guard is sitting at a chair at a front gate and he gets up to go get a cup of coffee and twists, is that compensable just because he's a security guard? Let's say there's some incident that he sees and he has to move. I don't think so, but if he sees an incident and he gets up and he twists and he's pursuing someone, yes. I mean, that is different. Speed is inherent there. It's an element of the job. It doesn't have to be testimony in the record from somebody that says speed is a part of the job. Well, I guess what I would say here is the circumstances itself, in that situation, the example that I just gave, if they brought in a supervisor that said, no, he didn't have to react with speed even though he was a security guard. We don't require it. I think the commission has the right to make credibility determinations here. In that situation, I think we would all agree that's ridiculous. If somebody's stealing something and they're a security guard, to say that speed's not required. I say the same thing here. I think it's ridiculous to say that speed is not required when somebody overhead is calling his name and it's his job to look out for other machinery and look out below. Well, how do you distinguish this case from our decision in Hopkins? The difference between this case and Hopkins is two reasons. Number one, and I believe I addressed this in my reply argument, but in Hopkins, the determination medically in that case was that in Hopkins this was a spontaneous occurrence. It was the pop that he felt was caused by his degenerative disc disease. That was the only medical evidence there. In this case, the medical evidence that the commission adopted was not that degenerative disc disease caused this, not his preexisting condition. The twist caused a recurrent disc herniation here. The actual action, the mechanism of injury here is what caused the recurrent disc herniation. This was not a spontaneous occurrence. And actually, Dr. Skoleski says right in his record, this was not a spontaneous occurrence. Nothing about his preexisting condition caused this. The cause of his recurrent disc here was the twisting. In Hopkins, the cause of the pop was his preexisting condition. That was the only medical evidence that was adopted there. So I think that's a significant determination. Also in Hopkins, we don't have a finding of fact that speed there was an element of the job. He was responding to a coworker asking a question. Was there any risk of danger if he didn't answer that question? There's no evidence of that. There's no evidence there that he was to be looking out for anything that the job required him to be aware. There's no evidence there that anything dangerous could happen if it took him five minutes to answer that question. Is there evidence of that here? He's a spotter. He's supposed to look out for other equipment. He's supposed to move the hoist, and his name is being called. Let me ask you this. There's evidence that a coworker shouted his name, not to get lost in the minutia. Is there any evidence, was it determined later who shouted his name? For what purpose? Is it some coworker calling him for a cup of coffee? I mean, who called his name? The evidence shows, and I don't know if the person themselves actually identified in the testimony, but the evidence showed that the name would be called to move the hoist or to warn other equipment. Why his name was called in this particular situation, I know that he had the actual control to the hoist. Well, isn't that relevant, though? If somebody's calling him for something unrelated to his duties at the time, isn't that relevant? I don't think there's any evidence that he was ever called for something unrelated to the duties. I believe he was called because the hoist needed to be moved. That was my understanding in the testimony, was that he had the control and the hoist needed to be moved. But there's no evidence supporting why he was called? To show either way, is that what you're saying? I believe the testimony was to move the hoist. That was my understanding. So it has to support to affirm the finding, the factual finding here. I think there is support here that speed is an inherent element of the job. I don't think the opposite conclusion here is apparent. And based upon that, and based upon what he was doing at the time, which as I said, I think there is a difference between getting up to go get a cup of coffee and reacting to an overhead worker. I certainly think that the decision of the commission is not against the manifest way to the evidence. With regard to the issue of causal connection, I won't spend a lot of time on it. That's a medical credibility determination by the commission. The commission adopted Dr. Dworsky's testimony that the mechanism of injury caused the herniated disc. Also supported by Dr. Skleski's records. Thank you. Your time. You'll have time on reply. Counsel? Good morning. May it please the court, counsel, Liz LeBaron on behalf of the respondent Caterpillar, Inc. It's clearly the law in Illinois that it's not enough that you're injured at the place of employment. Your injury also has to arise out of some risk associated with that employment. And it's clear that petitioner's injury in this case did not arise from any employment-related risk. Petitioner was in a seated position. Someone in the hoist called his name. He turned to respond. Petitioner did not move quickly. He did not testify he was to move quickly. And there was no requirement that he move quickly to operate. The arbitrator says he jumped up and felt pain. I stood up fast. I have petitioner's testimony. This is the record at 1.20. I was sitting down on a metal frame. Who would signal you? The guys in the hoist. How would he signal you? He signal me or he say, Rocky. He shouted at me, Rocky. I turned around and I pinched my nerve. You turned around and you were in a seated position? Yes. So you're saying he never testified he stood up fast? No, he did not. This is his direct testimony on direct examination. He didn't even testify that he stood up. He was seated down. He turned to look at the gentleman in the hoist. So where did arbitrator Kinnaman come up with this? I think she came up with it from one of the medical records when he initially reported it. He said he stood up fast. It is not from his direct trial testimony. But it is in evidence? It is in the medical records, yes, Your Honor. Petitioner's job responsibilities of the hoist spotter were very simple. He was an injured employee. It's undisputed that he was waiting for surgery on his left arm. He was given a nontraditional job which would not place his left arm at any risk. He testified that he had long periods of inactivity. They would last 45 minutes to an hour. During this period of time, he was allowed to sit down. His supervisor testified that he preferred him to be on his feet and alert. But he also testified that there was no consequence to sitting down. During one of these instances while he was sitting down, he heard his name called. In a seated position, he turned. This is an activity of daily living. We all turn in chairs when we hear our name called from time to time. Let me ask you this. If the record would support a finding that he jumped up or stood up fast, would he be covered under the compact as opposed to the factual scenario you're giving us? If we accept the other one, is he covered? I think there are circumstances where he might be covered. If he jumped up as the petitioner did in O'Fallon to actually do something that would be in a safety mode. The petitioner in O'Fallon was a hall monitor, a teacher who was chasing a child running in a hallway. If petitioner was doing something in that circumstance, chasing a self-guided vehicle, running to help a pedestrian, perhaps that would be appropriate. But the facts in this case don't support it. There's no testimony at all that this position was one of danger. Well, but her argument is, given the respect, is that it should be obvious that this job, part and parcel of the job is to protect other individuals who are working there. It's to protect the people on the ground from, I believe, falling objects from people doing overhead work. So it's not like an office worker who gets up out of a chair and moves. There's an inherent element of protecting coworkers. So is her argument that far-fetched that, you know, as part of this, when you have to protect the physical safety of those around you, you may have to move quickly? It is not that far-fetched, but there is no evidence to support it. It's simply an inference. There is no testimony that this job presented danger. There's no testimony that it required movement to do it. Could he sit in a chair and say, hey, watch out for the hoist? This isn't similar to a police officer or a security guard. This is an injured employee doing a warning job. It can be done verbally. But if he doesn't move fast, arguably somebody could be seriously hurt, correct? If he's not alert, somebody could be seriously hurt. But I don't think there's any evidence that this overhead hoist work presented any degree of danger. Certainly not from Strack and certainly not from the petitioner himself. This is an inference fraud just because the job is called a hoist spotter. And there's no indication that he had to move quickly at any time to prevent a damage. The thing is, is that he wasn't doing any of those activities when he was injured. He was simply sitting down. It's not even clear that when they shouted his name, they wanted him to operate the hoist. For all we know, they shouted his name because they were getting ready for a coffee break. That's what I've asked. So it's not definitive in the record? It's not in the record. Just that the gentleman in the hoist called his name. All right. If we find that his work activities did expose him to an increased risk of injury, why are you saying that there's no causal connection? You recognize the testimony of the doctor. One doctor says it was. Other doctors said it wasn't. It's conflicting medical testimony. Is it not? Yes, there is conflicting medical testimony. The origin of his risk is not in his employment. The origin of his risk was, like the plaintiff in Hobson, unique to his degenerative condition. Dr. Mather credibly testified, and he is the only spine surgeon who testified in this case, that this was the natural progression of his disease following his 1995 surgery. And he further stated that the mechanism of injury in this case, which is turning in a seated position, is not consistent with a recurrent disc herniation or with compression of the stenosis. He says that in a seated position, your neuroforamen are wide open and would not be injured. The only testimony that says there is a causal connection is from Dr. Dworsky, who is a general orthopedic. He was the petitioner's IME physician. And he was relying on a quick and sudden twist, but there is no evidence in this record from petitioner's testimony that there was a quick and sudden twist. What doctor did you just refer to? Dr. Mather was the respondent's IME physician. He's an adult spine specialist. What was the opinion of Dr. Skoletsky? Dr. Skoletsky did not testify. He was a treating physician, and he said that there was a recurrent disc herniation. I do not believe that Dr. Skoletsky gave any opinion on causal relationship. I thought that he opined Clayman's injuries were the result of his accident on August 15, 2000 and not the result of degenerative changes or a spontaneous occurrence. I did not recall Dr. Skoletsky did not testify. Only his medical records were submitted. And I do not believe there was a causal opinion in there. Only that he had a recurrent disc herniation. This case is similar to Hopkins in that this court found that sitting in a straight-back chair, hearing your name called and turning to respond to a co-worker is an activity of daily living, and it does not arise out of or in the course of your employment. Thank you. Thank you, counsel. You may reply. Just a couple of things. I asked counsel whether there was anything in the record that he reacted fast here. And on page 9 of my original brief, I cite what was actually an accident report filled out the day of the accident by a petitioner where he said, due to restrictions, I work in Department 2007, and I have to watch the hoist. And as I sat down on a frame, I stood up fast and rolled the cheek of my left buttock on a stud. That's right in the accident report that he reacted fast. Now, counsel admitted that the job of these spotters was a warning job, to warn, to watch out for traffic and other machinery, to warn. Now, I think there's a distinctive difference here whether Mr. Flores was sitting behind a desk with a microphone to warn or whether he was required to respond, to alert. He was required to respond. He was required to move the hoist. And in this case, what happened when his name was called? Mr. Flores testified on pages 119 and 120 of the transcript as to the procedure here. The procedure was they would call his name when the hoist needed to be moved. When did the hoist need to be moved? When they needed to go to another project, when there was machinery in the way, when there was a problem there. Mike, he indicated, called his name. That's what he was reacting to in this case. Counsel also admitted there would be a difference if, as I indicated, a security person is merely getting up out of a chair or getting up out of a chair to chase someone. What was Mr. Flores doing at this time? Getting up to react to Mike overhead. What was his job? His job was one to ensure the safety while the hoist operators were acting. So I don't think it's against the manifest way to the evidence here for the commission to find speed is an inherent risk of the job. Is it an inherent risk of every action that Mr. Flores would have done as a hoist operator? No, and I don't think that's exactly what they're saying. As I said, if he were getting up to get a cup of coffee, I think this would be a different story. But we know from his unrebutted testimony he was getting up to react to Mike, Mike who was up above in the hoist. I think that makes a huge difference here. And the record here shows that that was his job as a spotter. But how about if he doesn't think speed's an inherent part of his job, isn't that a relevant consideration? He's the person who is reacting. If he doesn't know he has to react fast, isn't that a little bit problematic? I don't think there's any evidence here that he doesn't think that speed was an inherent part of his job. Did he testify that it was? He testified that, he testified, I believe on page 121 was when he testified to the incident. He suddenly twisted in order to look up to Mike and respond. As he was getting off of this tractor frame, and as I indicated. He could have twisted looking up to Mike to respond when he got up slowly too, couldn't he? Well, but he had to get up to move the hoist, that's my understanding. Well, he could get up slowly to move the hoist, couldn't he? He doesn't have to get up fast. I think he had to get up to move to go to move the hoist, that's my understanding as to what. Well, there's no reason why he has to get up fast. Because he's required to react when they. Well, that's reacting. I mean, look, is there testimony in the record that he had to get up quickly as part of the job if he was sitting down? There's testimony in the record by Mr. Streck that that's why they were not supposed to sit down. They needed to be on their feet and aware. Because it was their job to keep this area safe. You're trying to write that down. I think we've got to concede there's nothing in the record that says he had to get up fast. No one testified to that. He could have, but he didn't. I think he testified that when he received a signal from the maintenance crew that it was his job to react. He had to watch for traffic and he had to move the hoist. I mean, I think that supports the commission's finding here that he had to react with speed in this situation. Okay. I mean, if that's your interpretation. I think that was the commission's interpretation is that when he was performing this, he was reacting with speed. I think the evidence supports that. The accident report supports that. Mr. Streck supports that. No, no. What it supports, the accident report and the medical report, supports the self-description of what he did. You see, I got up. I got up. That's what it supports. I think what the court is asking, what is the requirement of the job? The requirement of his job is to maintain safety in that area. And that's why I think there is a difference between he's getting up to go to the restroom, he's getting up to get a cup of coffee, he's getting up to react to the hoist operator up above. That's what he's getting up to do. And that's why I would say I think there's a big difference here between a security guard getting up to go to the restroom or a security guard getting up because he's tired of sitting and a security guard getting up out of a chair to pursue a suspect. So what is it when he hears his name as a hoist, I mean, I don't have a real good picture of this, what is it that he's to do? What he's to do when he hears his name is he may have to move the hoist to avoid other machinery or warn those who are down on the floor below. That's what his job was as a spotter, to prevent. He was basically a warning, and that's what counsel admitted here. That was his job, to warn and to keep the area safe where they were working with the hoist. There may be material down below, or there may be material falling. He may have to watch individuals down below. He was to protect the safety of the area with the hoist operators up above. That was his job as a warning. So you're putting this description that when you are called, you are called either to warn or to remotely move this hoist away from people for their safety, okay? And that you have to do that with great dispatch and speed, right? I think that's the entire job of the spotter here, which is as a warning. He's a spotter because he's there to maintain the safety in the area when they're working, just as a security guard is there to maintain safety. So when he's called, he has to react. That's what his whole job is. And that's why I think the commission here found he was called and he did react. That's what happened here. And that's why it was important that he react. Thank you. Thank you, counsel, for your arguments in this matter this morning. It will be taken under advisement.